## UNITED STATES v. SEABOARD WESTERN GRAIN CORPORATION.

No. 37154.

District Court, E. D. New York.

Nov. 4, 1937.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Maurice Z. Bungard, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Otto, Easterday & Warburton, of New York City (Henry E. Otto, of New York City, of counsel), for defendant.

BYERS, District Judge.

A criminal information was filed July 9, 1937, against the above-named defendant, charging violation of the United States Grain Standards Act, title 7 U.S.C. § 71 et seq. (7 U.S.C.A. § 71 et seq.), in that nearly a year earlier, on August 4, 11, 12, 19, 25 and 26, 1936, the defendant sold seven different truck loads (500 bushels) of corn by grade, to wit, "No. 2 Yellow Corn," for shipment in interstate commerce, which corn had not been inspected and graded in accordance with the statute.

The allegations are comprised in seven counts, the last three of which, through typographical mistake, are misnumbered counts VI, VIII and IX instead of V, VI and VII. The last count was withdrawn at the close of the trial, as being repudiated by the evidence.

It is provided in section 85 of the statute that:

"Any person who shall knowingly violate any of the provisions of sections 76 or 79 to 83, inclusive, of this chapter, * * * shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not more than $1,000, or be imprisoned not more than one year, or both."

In section 74, the Secretary of Agriculture is authorized to fix and establish standards of quality for corn and other grains, and to alter or modify such standards as required. In section 76, it is provided that, whenever standards shall have been fixed and established under this chapter, shipment or delivery for shipment in interstate or foreign commerce by grade is prohibited "unless the grain shall have been inspected and graded by an inspector licensed under this chapter and the grade by which it is sold, offered for sale, * * * be one of the grades fixed therefor in the official grain standards of the United States," subject to certain provisos not here involved. Section 77 forbids a representation attaching to grain so shipped other than as shown by the certificate of inspection, and authorizes the Secretary to cause examinations to ascertain whether the grain does in fact conform to the grade so shown.

The defendant is charged with violating sections 72 to 77 of the law.

When the case was called for trial, both the government and the defendant waived a jury and submitted the cause to the court for disposition. Probably this was proper. Schick v. United States, 195 U.S. 65, 24 S.Ct. 826, 49 L.Ed. 99, 1 Ann. Cas. 585.

The corn involved was sold on July 10, 1936, through two written contracts, by the defendant in New York City to the Poultrymen's Service Corporation of Toms River, New Jersey. The lots were of 2,000 and 5,000 bushels, respectively, of "No. 2 Yellow Corn guaranteed cool and merchantable."

The purchaser testified at the trial, that the entire 7,000 bushels of corn as contracted for were duly delivered to the truckman employed by it to pick up the corn at the elevator of the New York State Barge Canal in Brooklyn, and that it was inspected by the purchaser's foreman, a farmer, and that the corn so delivered conformed to the requirements of the contracts as to quality and that the purchaser had made no complaint to the United States Government or any agency or department thereof with reference thereto, and was fully satisfied with the corn as delivered.

It will be seen that the information has to do with 3,000 bushels, or less than half the amount covered by these contracts.

The 2,000 bushel contract covered spot grain; i. e., corn then ready for delivery in the said elevator, and the 5,000 bushel contract covered corn to arrive and to be taken by the purchaser at his option during the month of August, 1936.

The contracts read in part: "Chicago, Milwaukee, Duluth, Superior, Buffalo or New York (Seller's Option) inspection and weights. Other conditions as printed on the back hereof. If not correct advise us at once. Demand draft with customary documents attached."

Thus corn inspected and graded at any of the places named was contemplated by the parties.

It should be stated that the Government does not dispute that this corn was duly inspected by Government inspectors in Chicago and certified as "No. 2 Yellow Corn," and it does not appear that any departmental steps were taken pursuant to the provisions of section 77 above referred to, upon the theory that the corn was incorrectly certified.

The question for decision is whether a violation of this statute has been established under the evidence, on the theory that there should have been a reinspection before delivery was made at the State elevator in this district.

Defendant's Exhibit D consists of two "Federal Appeal Grade Certificates" issued June 5 and 6, and its Exhibit E is a like certificate issued on May 28, 1936. The grain ex S. S. Tomlinson covered by the June 5th and 6th certificates arrived at the Marine elevator in Buffalo on June 9th and was loaded into the barge Andy on July 3rd, and arrived at the New York State elevator in Brooklyn on July 15th.

The corn ex S. S. Adam E. Cornelius covered by the certificate of May 28, 1936, was delivered at the elevator in Buffalo on June 2nd, loaded into the barge Ryan on June 19th, and delivered to the New York State elevator on July 3rd.

As to this entire grain, it is stipulated for the Government that both in the elevator at Buffalo and in the elevator in New York, *identity was preserved*.

The showing therefore is that this corn was in fact "No. 2 Yellow Corn" according to Government inspection and grading, and according to the contract specifications, and that the purchaser found it to be such.

There is a conflict in the evidence as to whether this corn ever lost its grade as established by the said certificates. For instance, Laurel Duval, chief of the Grain Inspection Department of the New York Produce Exchange, in charge of inspections under the Grain Standards Act by inspectors licensed by the United States Department of Agriculture, testified that on August 24, 25, or 26, 1936, 1,500 bushels of this particular corn had been inspected and graded by his subordinates and found to be cool and merchantable. He says as to lots 464 and 467: "I have an inspection made out of those lots under the Grain Standards Act, 467, No. 2 Yellow Corn."

As opposed to this, Schaefer, a Government sampler, took samples after the corn had been loaded from the elevator into trucks, which samples were graded and examined by the Government witness Kurtz, and he graded the corn as No. 3 and 4, because of the presence of foreign matter. So, at best, there is a difference of opinion between experts respecting samples taken from these shipments.

It is recognized that this aspect of the case is not controlling, because the Government's position is that, even though all the corn was in fact No. 2 Yellow, the offense was committed by reason of the failure to have a reinspection as required by the regulations. The contention is thus stated in the Government's brief: "It is the contention of the government that in such cases (as this) the provisions of the law and regulations promulgated thereunder, require a new grading and inspection."

There is no provision of the statute which supports the foregoing, and recourse must be had, therefore, to the regulations to ascertain whether the defendant is guilty as charged.

Apparently reliance is had upon the following:

"Regulations (effective July 1, 1935) of the Secretary of Agriculture under the United States Grain Standards Act."

"Regulation 8. Provisions governing grain merchandising.

"Section 1. Inspection to be obtained, where.—For each shipment of grain in interstate or foreign commerce, from or to a place where a licensed inspector is located, which is sold, offered for sale, or consigned for sale by grade, an inspection by a licensed inspector must, in accordance with section 4 of the act, be obtained at the shipping point, at some convenient point en route, or at destination.

"Sec. 2. Limitations on use of 'Heavily-loaded car' certificate.—For the purposes of the act, an 'in' inspection 'Heavily-loaded car' certificate shall not be valid to represent the grade of the grain covered thereby for an 'out' shipment from the place of such inspection.

"Sec. 3. Arrival inspection valid for out shipment of reconsigned cars.—An 'in' inspection of grain in a car performed on arrival at an inspection point, except in the case of a heavily-loaded car, shall also be deemed valid for the purpose of out shipment from such inspection point under the following conditions only:

"(1) When the out shipment or delivery for shipment is made not later than the close of the second business day after the date of such inspection;

"(2) When the grain covered by the inspection has not in the meantime been removed or transferred from the car in which it was inspected;

"(3) When the identity of the grain has not been changed, and

"(4) When the certificate of grade bears the statement regarding its validity for 'in' and 'out' inspection as required by subdivision (c) of section 26 of regulation 2."

The latter is as follows:

"(c) A statement showing whether the inspection represents an in, out, export, cargo, submitted sample, reinspection, 'in' heavily loaded car, or otherwise, as the case may require. For 'in' inspections of grain arriving at any inspection point in railway cars, except in the case of a heavily loaded car as provided in section 31 of this regulation, the certificate shall have stamped or printed upon either the face or the reverse side thereof substantially the following:

" 'This certificate is valid for "in" inspection, but not for "out" inspection, except when shipment is made in the same car not later than close of second business day after date hereof and without removal of grain or any change of its identity.'

"If printed or stamped on the reverse side the words 'See reverse side' shall be conspicuously stamped or printed on the face of the certificate;"

It will be seen that the foregoing regulations have to do with a special kind of certificates; namely, heavily loaded car certificates and "in" inspection certificates, and the validity and duration of the latter for out shipment.

The provisions seem to be aimed at the practice governing railway car shipments.

■ It is probably true that the reasons which influenced the Department in deciding upon the duration of an "in" inspection certificate would apply to a cargo of grain shipped in a barge, but the regulations are not so worded, and in a criminal case the defendant should not be convicted of the breach of an inference to be drawn from a departmental regulation.

Whether there is any intrinsic difference for present purposes, between a "Federal appeal certificate" such as those in evidence and the ordinary inspector's certificate referred to in the regulations above quoted, is not made to appear in either of the briefs.

The form of these "Federal appeal grade certificates" is not that prescribed in subdivision (c) of section 26 of regulation

2, and this may be important, since the latter certificates must bear, either upon their face or the reverse side, the statement with reference to the validity of an "in" inspection for shipment out, and there is no such language on the certificates in evidence. The presence of such an admonition would put the shipper upon notice of his duties as conceived by the regulations.

That the regulations were deemed deficient with respect to deliveries into trucks, necessarily results from the fact that inspection in trucks was not the subject of any regulation prior to January 20, 1937, which was nearly six months *after* the transactions now under examination. If the earlier regulations were adequate to spell out a violation of law on the part of this defendant, it ought to be possible for the Government to point to some clear and unmistakable provision current during August, 1936, to that effect; reasonable doubt upon this aspect of the case results from the testimony of Mr. Duval, above referred to, that prior to August 24, 1936, there were no inspections made, under the Grain Standards Act, of grain delivered by the elevator to trucks.

He also said that such deliveries constitute recent business and, to substantiate that assertion, the defendant offered in evidence a bulletin released January 26, 1937, by the Department of Agriculture, headed "Grain Moving Interstate in Trucks Must Have Government Inspection," and the bulletin reads in part as follows:

"A ruling requiring government inspection of grain transported by motor trucks in interstate commerce was announced today by the Bureau of Agricultural Economics.

"Inspection officials said that inspection by a licensed inspector under the Grain Standards Act 'must be obtained on grain which is sold by grade and shipped or delivered for shipment in interstate commerce from or to an inspection point.' The burden of obtaining inspection is upon shippers.

"Officials explained that the ruling puts grain transported by motor truck under the same requirements as grain transported by rail or boat. It was necessitated by the increasing use of motor trucks in the transportation of grain across State lines."

If the Government deemed such a delivery as is here involved, to require a special ruling in January of 1937, it is

difficult to conclude that this defendant should have known six months earlier, that it would be guilty of a misdemeanor if it failed to anticipate that departmental attitude of mind.

It results therefore that the regulations upon which reliance is had by the Government are insufficient to sustain a criminal prosecution against this defendant.

It will be assumed, but not decided, that the transaction under review was of such a nature that, if the defendant had sold or contracted to sell into interstate commerce corn as No. 2 Yellow Corn which was not that in fact, it would have subjected itself to this prosecution, which is another way of saying that this is assumed to have been a transaction in which interstate commerce is involved.

The Government contends that so much time elapsed between the inspection in Chicago and the delivery to the Poultrymen's Service Corporation in New York that reinspection of the corn was required, and that this must be so because the corn came to rest in the elevator in Buffalo and again in the elevator in New York before it was delivered.

The Department of Agriculture had once certified that this corn was of the grade described in the contract, and it would seem that the appropriate proceeding, if the corn was thought to have lost the character ascribed to it by the certificate, would have been one pursuant to the following provisions of section 77 of the statute:

" * * * and the Secretary of Agriculture is authortized to cause examinations to be made of any grain for which standards shall have been fixed and established under this chapter, and *which has been certified to conform to any grade fixed therefor in such official grain standards, or which has been shipped or delivered for shipment in interstate or foreign commerce.* [Ital. supplied] Whenever, after opportunity for hearing is given to the owner or shipper of the grain involved, and to the inspector thereof if the same has been inspected, it is determined by the Secretary that any quantity of grain has been incorrectly certified to conform to a specified grade, *or has been sold, offered for sale, or consigned for sale under any name, description, or designation which is false or misleading, he may publish his findings.*" (Italics supplied.)

If this corn was incorrectly certified in Chicago or if, by reason of the lapse of time, or because of the handling involved at Buffalo or New York, there was anything false or misleading in the contract description which has been quoted, proceedings should have been taken by the Secretary in conformity with the foregoing, in preference to a criminal prosecution under section 85, which applies to any person who shall *"knowingly* violate any of the provisions of sections 76 or 79 to 83, inclusive." (Italics supplied.)

The Government has failed to prove anything against the defendant which amounts to a *knowing* violation of the law. It bought and sold "No. 2 Yellow Corn" which had been lawfully inspected and properly certified.

The Government has failed to sustain its burden of proof, and the information will be dismissed.